**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**CHARLESTON DIVISION**

**MICHELLE T.,**

      **Plaintiff,**

**vs.**                                   **CIVIL ACTION NO. 2:23-CV-00176**

**KILOLO KIJAKAZI,
ACTING COMMISSIONER
OF SOCIAL SECURITY,**

      **Defendant.**

<u>**PROPOSED FINDINGS AND RECOMMENDATION**</u>

This is an action seeking review of the final decision of the Acting Commissioner of Social Security denying the Plaintiff's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401-433. By Order entered March 8, 2023 (ECF No. 3), this case was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence, and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are the Plaintiff's Brief in support of her claim and the Defendant's Brief in Support of Defendant's Decision. (ECF Nos. 8, 9)

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the United States District Judge **DENY** the Plaintiff's request for remand (ECF No. 8), **GRANT** the Defendant's request to affirm the decision of the Commissioner (ECF No. 9); **AFFIRM** the final decision of the Commissioner; and **DISMISS** this matter from the Court's docket for the reasons stated *infra*.

1

**Procedural History**

The Plaintiff protectively filed her application for DIB on September 10, 2020 alleging her disability began July 26, 2020 due to pseudotumor cerebri, migraines, anxiety-panic disorder, major depressive disorder, tremors, bulging discs, spinal stenosis, degenerative disc disease, type 2 diabetes, and trouble sleeping. (Tr. at 38, 268) Her claim was initially denied on January 11, 2021 and upon reconsideration on July 1, 2021 (Tr. at 38, 84-101, 103-110). Thereafter, the Plaintiff filed a written request for hearing on August 5, 2021. (Tr. at 143-144)

An administrative hearing was held on June 9, 2022 before the Honorable Francine Serafin, Administrative Law Judge ("ALJ"). (Tr. at 63-83) On August 3, 2022, the ALJ entered an unfavorable decision. (Tr. at 30-54) On January 5, 2023, the Appeals Council denied the Plaintiff's Request for Review, thus the ALJ's decision became the final decision of the Acting Commissioner. (Tr. at 1-7)

On March 1, 2023, the Plaintiff brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1) The Defendant, (hereinafter referred to as "the Commissioner") filed a Transcript of the Administrative Proceedings. (ECF No. 5) Subsequently, the Plaintiff filed a Brief in support of her complaint (ECF No. 8); in response, the Commissioner filed a Brief in Support of Defendant's Decision (ECF No. 9), to which the Plaintiff filed her Reply Brief (ECF No. 10). Consequently, this matter is fully briefed and ready for resolution.

**Plaintiff's Background**

The Plaintiff was 44 years old as of the alleged onset date, and considered a "younger person", though she transitioned to a younger individual age 45-49 during the underlying

proceedings. See 20 C.F.R. § 404.1563(c). (Tr. at 52) She graduated high school and completed a year of college at Southern West Virginia Community College, and obtained a certificate in phlebotomy in 2003. (Tr. at 269) For the last fifteen years before applying for benefits, she worked as a fast-food cook, an administrative clerk, a nursery school attendant, and a waitress, however, none of these jobs reached substantial gainful activity levels, therefore, she had no relevant past work. (Tr. at 35, 47, 75)

**Standard**

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(i), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. § 404.1520. If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 404.1520(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 404.1520(b). If the claimant is not, the second inquiry is whether the claimant suffers from a severe impairment. Id. § 404.1520(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 404.1520(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. Id. § 404.1520(f). By satisfying inquiry four, the claimant

3

establishes a *prima facie* case of disability. <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, <u>McLain v. Schweiker</u>, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. <u>Id</u>. § 416.920(g). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. <u>McLamore v. Weinberger</u>, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration ("SSA") "must follow a special technique at every level in the administrative review process." 20 C.F.R. § 404.1520a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment.

Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in Section 404.1520a(c):

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in

4

which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. See 12.00E of the Listings of Impairments in appendix 1 to this subpart.

(4) When we rate the degree of limitation in the first three functional areas (understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself), we will use the following five-point scale: None, mild, moderate, marked, and extreme. The last point on the scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. Id. § 404.1520a(d)(1).

Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. Id. § 404.1520a(d)(2).

Finally, if the SSA finds that the claimant has a severe mental impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the claimant's residual functional capacity. Id. § 404.1520a(d)(3). The Regulations further specify how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

At the administrative law judge hearing and the Appeals Council levels, the written decision must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination

5

and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

Id. § 404.1520a(e)(4).

**Summary of ALJ's Decision**

In this particular case, the ALJ determined that the Plaintiff met the insured status requirements through March 31, 2025. (Tr. at 35, Finding No. 1) Next, the ALJ determined the Plaintiff satisfied the first step of the sequential evaluation process because she had not engaged in substantial gainful activity since the alleged onset date of July 26, 2020. (Id., Finding No. 2) Under the second inquiry, the ALJ found that the Plaintiff had the following severe impairments: migraine headaches; degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; stenosis; bursitis; degenerative joint disease; obesity; conversion disorder with mixed symptoms; major depressive disorder and generalized anxiety disorder. (Id., Finding No. 3) At the third inquiry, the ALJ concluded the Plaintiff's impairments did not meet or equal the level of severity of any listing in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. at 36, Finding No. 4)

The ALJ then found that the Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except she can

> occasionally climb ramps and stairs but can never climb ladders, ropes, or scaffolds. She can occasionally balance, stoop, kneel, crouch, and crawl. She is capable of tolerating occasional exposure to extreme cold, heat, vibration, and atmospheric conditions as that term is defined in the Selected Characteristics of Occupations (SCO). The claimant must avoid all workplace hazards such as moving machinery or unprotected heights. She is capable no interaction with the public. She can tolerate low stress work, meaning a position in which the work would only require infrequent changes in the daily work routine and the ability to make simple work-related decisions only occasionally.

6

(Tr. at 40, Finding No. 5)

At step four, the ALJ found the Plaintiff has no past relevant work. (Tr. at 47, Finding No. 6) However, at step five, the ALJ found that based on her age, education, work experience, and RFC, the Plaintiff is capable of performing other jobs in the national economy. (Id., Finding Nos. 7-10) Finally, the ALJ determined the Plaintiff had not been under a disability since July 26, 2020 through the date of the decision. (Tr. at 48, Finding No. 11)

### The Plaintiff's Challenges to the Commissioner's Decision

The Plaintiff alleges the ALJ's RFC is flawed to the extent that it does not have any manipulative restrictions, and that the evidence of record demonstrate that the Plaintiff's tremors were far greater than a minimal impairment. (ECF No. 8 at 3-7, 8-9) Additionally, the Plaintiff argues that that ALJ's RFC assessment fails to comply with Dowling v. Comm'r of SSA, 986 F.3d 377 (4th Cir. 2021) because she only referenced Section 404.1545 and Social Security Ruling (SSR) 96-8p in a boilerplate introductory section of the written decision, indicating a reliance on an incorrect regulatory framework. (Id. at 7-8) The Plaintiff contends that the ALJ failed to account for her moderate limitations in the functional area of concentrating, persisting, or maintaining pace in the RFC; the ALJ also failed to explain why those limitations were excluded from the RFC assessment. (Id. at 10-13) Because of these errors, the Plaintiff asks the Court to remand this matter for further administrative proceedings. (Id. at 14)

In response, the Commissioner contends that the ALJ thoroughly explained the Plaintiff's medical history and treatment of tremors, noting that her treating neurologist determined they were exacerbated by increased financial and social stressors along with her high caffeine intake, and that she experienced significant improvement when she used her medications and worsened when

she stopped taking them, and accounted for that impairment in the RFC by limiting her to a reduced range of sedentary work. (ECF No. 9 at 10-12) Further, the ALJ explicitly considered the Plaintiff's manipulative limitations, but did not include them in the RFC because she found no basis for them in the record. (Id. at 12-13) Because the record showed that the Plaintiff's tremors improved with medication and regular mental health treatment, and also showed that the Plaintiff had a pattern of failing to seek treatment or stopping her medications on her own initiative, the ALJ properly considered this evidence when evaluating the Plaintiff's symptoms, and ultimately declined to add manipulative limitations in the RFC. (Id. at 13-14) In short, the ALJ need only include the Plaintiff's credibly established limitations in the RFC and did so in this case. (Id. at 14)

Regarding the Plaintiff's limitations in concentration, persistence, and pace, the Commissioner argues that these do not necessarily indicate work-related functional limitations, and further, the ALJ considered the evidence related to same, noting that the Plaintiff reported improvement when she complied with her medication regimen and showed progress once she began attending psychotherapy sessions. (Id. at 15-16) The Commissioner adds that even though the Plaintiff does not identify what evidence the ALJ failed to acknowledge that contradicts her RFC findings, the ALJ in this case complied with her legal obligations, and fully accounted for the Plaintiff's moderate limitations in the RFC. (Id. at 16-17)

The Commissioner asks this Court to affirm the final decision because it is supported by the substantial evidence. (Id. at 17)

In her reply brief, the Plaintiff reasserts her contention that the ALJ improperly conflated her RFC assessment with her symptoms. (ECF No. 10 at 1-2) Further, the evidence showed that the Plaintiff tried numerous medications to treat her tremors, but she had to discontinue them due

to side effects – however, the record shows that besides caffeine use, which was to be tapered down, mental impairments also contributed to the Plaintiff's tremors, which supports a finding that she had some degree of manipulative limitations that should have been included in the RFC assessment. (Id. at 2-5) Finally, the Plaintiff emphasizes that the ALJ failed to explain why the moderate limitations in maintaining concentration, persistence or pace were excluded from the RFC, thus precluding meaningful review. (Id. at 5-7).

**The Relevant Evidence of Record**[1]

The undersigned has considered all evidence of record, including the medical evidence, pertaining to the Plaintiff's arguments and discusses it below.

**The Medical Record:**

Treatment for Tremors:

Prior to the alleged onset date, on April 19, 2018, the Plaintiff underwent a lumbar puncture after reporting headaches and facial drooping (Tr. at 360). She was found to have a pseudotumor cerebri (Id.).

In June 2018, the Plaintiff underwent an electroencephalogram ("EEG"), which showed no clear paroxysmal changes or epileptiform discharges (Tr. at 378). A second EEG on March 7, 2019, similarly, showed no electrographic seizures or any interictal epileptiform activity (Tr. at 432-433). However, she exhibited multiple episodes of her head shaking side to side and whole-body tremors (Id.)

---

[1] The undersigned focuses on the relevant evidence of record pertaining to the issues on appeal as referenced by the parties in their respective pleadings. Therefore, for purposes of this Proposed Findings and Recommendation, the focus is on the Plaintiff's moderate limitations in concentrating, persisting, or maintaining pace and alleged manipulative limitations as a result of her tremors.

In January 2019, the Plaintiff was referred by her neurologist to a psychiatrist for treatment of her anxiety, however, by March 2019, she still had not made an appointment (Tr. at 435, 452, 459). The Plaintiff's neurologist stressed to her that her tremors were not epileptic in nature and noted that her tremors had worsened due to increased financial and social stressors (Tr. at 438). The neurologist stressed the need to establish treatment with a psychiatrist (Id.).

The Plaintiff began psychiatric treatment in June 2019 and was prescribed Topamax, which alleviated her symptoms significantly (Tr. at 414). She reported in September 2019 that, while on the medication, she had gone sixteen days without a visually noticeable tremor and had headaches but no migraines (Id.). In December 2019, she displayed intact finger-to-nose coordination, and her tremor was not present at the beginning of the exam but progressively increased (Tr. at 412).

In February 2020, the Plaintiff reported not having started new medication for her tremors, Propranolol, because she "was nervous about it dropping her BP" and she had started a new job and thought the tremor had worsened since then; she also reported her headaches worsen with the tremor (Tr. at 403). She cancelled her last appointment with psychiatry as well (Id.). However, by March 2020, the Plaintiff started Propranolol, and reported her tremors were "a little better", and she had not noticed any significant fluctuations in her blood pressure or side effects (Tr. at 581). In May 2020, her tremors improved still, but her headaches were the main issue; her current prophylaxis could not be increased due to side effects, however (Tr. at 575).

In August 2020, the Plaintiff reported that she could no longer tolerate Propranolol due to issues with high blood pressure and had reduced her dosage herself (Tr. at 565). She also reported that her tremors had become more problematic and stated that she had increased familial stressors at the time (Id.). On mental status exam, her response time was delayed, but she was alert and

10

cooperative and had normal speech and language (Tr. at 567). She also had 5/5 motor strength, intact finger-to-nose coordination, and intact sensation (Id.). After this appointment, the Plaintiff was prescribed Primidone instead of Propranolol, but by September 2020, she had stopped taking the Primidone because it made her feel drowsy (Tr. at 559). She also reported drinking more than twenty cans of soda per day and was advised to begin tapering off the caffeine (Tr. at 559, 562).

In January 2021, it was noted that while the Plaintiff's tremor medication failed (Primodone) due to side effects, she reported significant improvement with her migraines since starting Botox in September 2020 (Tr. at 549, 555) During a January 2021 physical therapy visit for her tremors, the Plaintiff reported that they vary in location (head, hands, core, etc.) and duration, but occur daily (Tr. at 516). Her therapist noted that the examination revealed significant tremors and that the Plaintiff lost balance to the right several times in the clinic (Tr. at 517). Notes from her February 1, 2021 physical therapy visit state that the Plaintiff required several rest breaks due to worsening tremor (Tr. at 515), and during her February 24 visit, she demonstrated increased essential tremor, requiring increased rest breaks (Tr. at 523). During her March 16 visit, while the Plaintiff tolerated the session well, it was noted cone taps increased her essential tremor, but she continued to benefit from balance training (Tr. at 524). Two days later, on her March 18 visit, her therapy "will be placed on hold at this time", as the Plaintiff "has plateaued and [essential tremor] continues to negatively impact balance during daily activities." (Tr. at 525)

During a neurology visit in May 2021, Plaintiff's treating physician noted that Plaintiff had not been keeping up with her psychiatry appointments, and her tremor was "significantly provoked by her unmanaged anxiety and depression" (Tr. at 543). It was noted her tremor was mild at the beginning of the exam, but progressively increased (Id.)

In February 2022, the Plaintiff continued to complain of intermittent shaking spells (Tr. at 793-794). It was noted that the Plaintiff's tremors were "more manageable" with Propranolol, although she is unable to titrate dose due to side effects (Tr. at 794). Otherwise, the Plaintiff had normal orientation, normal speech and language, 5/5 muscle strength, intact reflexes and coordination, intact sensation, and normal gait on examination (Id.).

During a psychotherapy intake on March 8, 2022, the psychotherapist "[n]oticed some tremors, very emotional. Thought process slow at times noted. She reports that she loses her balance." (Tr. at 770) During her psychotherapy session on March 17, 2022, tremors were once again observed, and when the Plaintiff stood up and began walking out of the office, she "began to tremor and lost balance." (Tr. at 771) On March 29, 2022, the Plaintiff again had tremors during session on several occasions (Tr. at 773, 811). Tremors were again observed by the psychotherapist during session on April 14, 2022 (Tr. at 813); during her May 16, 2022 session, the Plaintiff was "very unstable on her feet due to tremors" and the use of a cane was suggested (Tr. at 817). At her next session on May 25, 2022, the Plaintiff presented with a cane; she was very emotional and her left hand was shaking during the session and body tremors were present (Tr. at 819).

Treatment for Mental Impairments:

The Plaintiff treated with Marshall Psychiatry and Behavioral Medicine prior to the alleged onset date from June to November 2019 (Tr. at 488-512). On examination, she had intact memory and concentration, appropriate thought process, orientation, and fund of knowledge (Tr. at 490, 496, 502, 510-511). Her treating physician noted that the Plaintiff had not previously sought therapy for her depression or anxiety despite past traumas and stressors (Tr. at 511).

During a psychiatry visit in August 2020, after the alleged onset date, the Plaintiff was

noted to have improved with her current medication (Tr. at 477). She reported a good mood, improved sleep and energy, and improved anxiety (Tr. at 477-478). She also had normal thought process, insight, judgment, memory, concentration, and orientation on examination (Tr. at 479-480). She was advised to return for an appointment in two months but did not have another appointment until February 2021, six months later (Tr. at 480, 473). At this time, the Plaintiff reported that she had not been doing well, had "a lot of stuff going on," and her tremors had gotten "bad" (Tr. at 473). On examination, she had normal speech, thought process, insight, judgment, and concentration (Tr. at 474-475).

During a psychiatry visit in September 2021, the Plaintiff reported increased tremors, depression, and anxiety, all resulting from increased family stressors (Tr. at 636). On examination, she had logical and goal directed thought process, good insight, good judgment, intact memory, intact concentration, and was fully oriented (Tr. at 636-637). She reported "some improvement" in her anxiety after using the medication Buspar in the past but had stopped taking it as she found it "unhelpful" (Tr. at 637).

The Plaintiff was frequently recommended to start psychotherapy and stated during her psychiatry appointment in September 2021 that she was amenable to starting therapy if given a list of therapists in her area but did not begin seeing a therapist until six months later in March 2022 (Tr. at 634, 637, 807). During this appointment, the Plaintiff reported depression, anxiety, and panic attacks, and mental status examination showed her concentration to be "distractible." However, she also showed normal orientation, motor activity, speech, affect, insight, judgment, memory, thought process, and perception (Tr. at 807). The Plaintiff continued with therapy through May 2022 and was noted to be "progressing" in her treatment (Tr. at 814, 816, 818).

13

<u>Consultative Examination:</u>

On January 4, 2021, the Plaintiff underwent a consultative examination by independent consultant Laura Cunnings, FNP-C (Tr. at 465-469). Ms. Cunnings noted that the Plaintiff displayed proper hygiene, was cooperative and friendly, and showed normal intellectual functioning (Tr. at 467). Ms. Cunnings wrote that tremors of the Plaintiff's head and voice were "very apparent," and that her gait was "unbalanced" but not unsteady (<u>Id</u>.). On neurological exam, the Plaintiff showed no evidence of atrophy and negative Babinski's signs; she was able to walk on toes but not heels, she could not perform a tandem gait but could squat without difficulty; and displayed normal sensation and reflexes (<u>Id</u>.). Overall, Ms. Cunnings opined that the Plaintiff's gait was unbalanced but did not put her at risk of falls and noted that she was able to get on and off the exam table without difficulty (<u>Id</u>.). Ms. Cunnings also characterized the Plaintiff's tremor "is not mild, but very apparent and significant" (<u>Id</u>.).

**Plaintiff's Function Reports:**

As part of her disability application, the Plaintiff completed two Adult Function Reports describing her subjective symptoms (Tr. at 278-287, 303-310). In the first report, dated October 22, 2020, the Plaintiff reported problems with lifting, squatting, kneeling, anxiety, and panic attacks (Tr. at 278). However, she also wrote that she could engage in a number of daily activities including preparing meals with multiple dishes, watching TV, spending time outside, reading, talking to others on the phone, and completing household chores such as cleaning, doing laundry, making the bed, and washing dishes (Tr. at 278, 280). She wrote that she shopped in stores a few times a month and could handle her own finances with no issues (Tr. at 281).

In the second report, dated February 15, 2021, the Plaintiff made similar reports about her

daily activities (Tr. at 303-308). Regarding her tremors, the Plaintiff reported that they cause her to lose her balance in the shower, and when her hands are shaking too hard or she is having a bad tremor, she cannot raise her arms or hold a comb, and has difficulties holding a razor to shave or holding a fork to eat (Tr. at 304). She indicated that her tremors affect her lifting, squatting, bending, standing, reaching, walking, kneeling, talking, stair climbing, memory, concentration, and use of her hands (Tr. at 308). She explained that at times, her tremors cause her body to be in constant motion – her head, torso, voice, and hands and makes her off balance; and her medicine makes her "brain fuzzy." (Id.) She stated she needs someone to accompany her for social activities because she can fall and lose her balance; she reported being embarrassed of her shaking because people stare (Tr. at 307). Regarding her mental impairments, the Plaintiff wrote that she had problems with memory and concentration, but did not report problems with completing tasks, understanding, following written instructions, or getting along with others, although she reported losing focus "half way" with spoken instructions, but does "better with written" (Tr. at 308).

**Prior Administrative Medical Findings:**

Debra Lilly, Ph.D., a state agency physician, reviewed the Plaintiff's medical records and mental impairments on November 28, 2020, and found that the Plaintiff had nonsevere mental impairments as she had only mild limitations in all four paragraph B criteria (Tr. at 91-92). In March 2021, state agency psychologist Jeff Boggess, Ph.D., reviewed the Plaintiff's medical records and agreed with Dr. Lilly's initial findings (Tr. at 106).

State agency physician Narendra Parikshak, M.D., reviewed the Plaintiff's physical impairments and opined that she was capable of occasionally lifting twenty pounds; frequently lifting ten pounds; standing or walking for six hours in an eight-hour workday; sitting for six hours

in an eight-hour workday; unlimited pushing or pulling; occasionally climbing ramps or stairs, balancing, stooping, kneeling, and crawling; never climbing ladders, ropes, or scaffolds; unlimited reaching; frequent handling; frequent fingering; and unlimited feeling (Tr. at 94-96). In March 2021, Rabah Boukhemis, M.D., reviewed the Plaintiff's physical impairments and agreed with Dr. Parikshak's RFC opinion but found no manipulative limitations (Tr. at 107-108).

**The Administrative Hearing:**

<u>The Plaintiff's Testimony:</u>

The Plaintiff testified that the main issue that prevents her from working is her balance – the shaking in her hands, head or torso makes it hard to do things. (Tr. at 67-68) She said people stare because of it and sometimes her voice has tremors, too, causing her to stutter and makes it difficult to talk on the phone. (Tr. at 68) She stated that she has tremors every day, throughout the day. (<u>Id</u>.) She testified that she still drives, but only short distances, and does not run errands, such as going grocery shopping or paying bills. (Tr. at 69-70) She testified that she loses her balance all the time, and does not like having to use a cane or being able to work. (Tr. at 70-71)

<u>The Vocational Expert's Testimony:</u>

The Vocational Expert characterized the Plaintiff's past work as a cook as a skilled, medium position, and her other work as semi-skilled, light positions (Tr. at 75). The ALJ posed several hypothetical scenarios including all of the Plaintiff's limitations as outlined in her RFC finding, and the Vocational Expert responded that the hypothetical individual would be capable of performing other jobs in the national economy (Tr. at 78-79).

**<u>Scope of Review</u>**

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In <u>Blalock v. Richardson</u>, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

<u>Blalock v. Richardson</u>, 483 F.2d 773, 776 (4th Cir. 1972) (quoting <u>Laws v. Celebrezze</u>, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence, however, the Court determines if the final decision of the Commissioner is based upon an appropriate application of the law. <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Further, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." <u>Oppenheim v. Finch</u>, 495 F.2d 396, 397 (4th Cir. 1974). If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." <u>Blalock</u>, 483 F.2d at 775.

**<u>Analysis</u>**

<u>The Absence of Mental Limitations in the RFC Assessment:</u>[2]

The RFC determination is the "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis." Social Security Ruling (SSR) 96-8p, 1996 WL 374184, at *1. The RFC is a finding as to the most a claimant can still do in a work

---

[2] The undersigned addresses the Plaintiff's challenges in reverse order, starting with the mental portion of the RFC assessment.

setting despite her functional limitations. See 20 C.F.R. § 404.1545(a)(1). The RFC is an administrative finding within the ALJ's exclusive jurisdiction. See Id. § 404.1546(c); see also Id. § 404.1520c(a) (instructing that ALJs will not defer to medical opinions or prior administrative medical findings). The ALJ reviews "all of the relevant medical and other evidence" in the record and is charged with resolving conflicts in the evidence. Id. § 405.1545(a)(3). See also SSR 96-8p, 1996 WL 374184, at *5.

There is no dispute between the parties as to the ALJ's finding that the Plaintiff had moderate limitations in concentrating, persisting or maintaining pace.[3] (Tr. at 39) Despite the Plaintiff's contention that the ALJ failed to incorporate these limitations into the RFC assessment, this District has recognized that mental limitations identified using the psychiatric review technique do not necessarily indicate work-related functional limitations that must be present in the RFC assessment. See *Wall v. Saul*, No. 2:20-cv-00460, 2021 WL 5225792, at *8 (S.D. W. Va. Nov. 9, 2021)(Tinsley, M.J.), *report and recommendation adopted*, 2021 WL 5230989, at *1 (S.D. W. Va. Nov. 9, 2021)(Copenhaver, J.); *Hedrick v. Saul*, No. 2:20-cv-00449, 2021 WL 5230735, at *7 (S.D.W. Va. May 21, 2021)(Tinsley, M.J.)(citing Mascio v. Colvin, 780 F.3d 632, 638 (4th Cir. 2015)(a claimant's "moderate limitation in concentration, persistence, or pace at step

---

[3] As noted by the Plaintiff (ECF No. 8 at 10, fn5), this area of mental functioning refers to:

> the abilities to focus attention on work activities and stay on task at a sustained rate. Examples include: Initiating and performing a task that you understand and know how to do; working at an appropriate and consistent pace; completing tasks in a timely manner; ignoring or avoiding distractions while working; changing activities or work settings without being disruptive; working close to or with others without interrupting or distracting them; sustaining an ordinary routine and regular attendance at work; and working a full day without needing more than the allotted number or length of rest periods during the day.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.00E(3). A "moderate limitation" means a claimant's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair." Id. § 12.00F(2)(c).

three" may not "affect [her] ability to work" and thus "does not translate into a limitation in [her RFC]")), *report and recommendation adopted*, 2021 WL 5230987 (S.D.W. Va. Nov. 9, 2021)(Copenhaver, J.).

Nevertheless, it is apparent that the ALJ not only considered the Plaintiff's limitations in this area, but made some accommodations for them in her RFC assessment. For starters, at step three, the ALJ noted that during her psychotherapy intake on March 8, 2022, the Plaintiff's attention and concentration were distractable, and progress notes showed she had decreased focus (Tr. at 39, 807, 809). The ALJ also considered the Plaintiff's statements in her initial Function Report, *supra*, with attention to her alleged lack of motivation to complete an activity and moving slowly to complete tasks (Tr. at 39, 284). The ALJ further noted, however, that the Plaintiff reported reading as a daily hobby (Tr. at 39, 282), and that during a consultative mental examination, she exhibited normal concentration, normal persistence, and normal pace (Tr. at 39, 382).

In her discussion of the evidence in support of the RFC determination, the ALJ observed that the Plaintiff's mental health status evaluations were "primarily unremarkable" (Tr. at 41). The ALJ also noted the Plaintiff's mental health treatment notes prior to her alleged onset date indicating improved symptoms and mental status examination findings with medication and treatment (Tr. at 44, 472-512, 631-638). The ALJ also noted that an intake form dated June 2020, just prior to her alleged onset date, the Plaintiff had been working and taking care of her parents, but she stopped taking her medication because she did not think it was working (Tr. at 44, 482-488). Of significance here, the ALJ observed that "[t]he records clearly document that the claimant improved with treatment" and after her alleged onset date, the Plaintiff saw a different provider

19

and was noted to be doing better with her current medication regime for her mental impairments, and although she was to return for treatment in two months, the Plaintiff did not return for six months. (Tr. at 44-45, 477-481)

During a telephone office visit on September 1, 2021 with her provider, the ALJ noted that while the Plaintiff endorsed family stressors exacerbated her tremors, balance issues, depression, and anxiety, her thought process was logical and goal directed, she had insight, good judgment, intact memory, as well as intact concentration (Tr. at 45, 637). The ALJ noted that the Plaintiff was referred to psychotherapy, as she would benefit from it, but it appeared from the records that she had not been attending therapy sessions by December 2, 2021 (Tr. at 45, 631-638).When the Plaintiff did participate in therapy, beginning March 8, 2022, the ALJ observed that she progressed, though she exhibited slow thought process, slow response and word searching (Tr. at 45, 768-774, 777-785, 806-820).

Being mindful of the Plaintiff's generalized anxiety disorder, depressive disorder and conversion disorder causing her tremors when stressed, the ALJ limited her to only low stress work, allowing for infrequent changes in the daily work routine and the ability to make simple work-related decisions only occasionally. (Tr. at 45) Due to her panic attacks around others, the ALJ also limited the Plaintiff to no interaction with the public (Tr. at 45, 284).

Regarding the mental consultant opinion evidence, discussed *supra*, the ALJ considered their findings, and found neither persuasive, determining that the Plaintiff did have severe mental impairments, resulting in moderate limitations in the "paragraph B" criteria, as supported by the medical evidence. (Tr. at 46-47, 91, 472-512, 631-638, 768-774, 777-785, 806-820) In sum, the ALJ determined that based on the foregoing evidence, again noting that the Plaintiff's progress

notes indicated she improved with treatment and primarily unremarkable mental status evaluations, supported the RFC assessment. (Tr. at 47)

To the extent the Plaintiff asserts that the ALJ's only reference to Section 404.1545 and SSR 96-8p "is in the boilerplate introductory section on page 3 of her decision" and "[f]or this reason alone, remand is required" pursuant to <u>Dowling</u>, 986 F.3d at 387 (ECF No. 8 at 8), the foregoing demonstrates this assertion lacks merit. The Fourth Circuit did not hold that remand was required for such a reason "alone" – in that case, the ALJ did not cite to these regulatory frameworks *at all*, but instead relied upon the incorrect regulatory framework: SSRs 96-7p and 16-3p, which pertain to the evaluation of a claimant's subjective complaints. <u>Id</u>. And further unlike <u>Dowling</u>, the ALJ here considered the Plaintiff's subjective complaints under the two-step test for symptom evaluation, and then went beyond her findings relating to the Plaintiff's subjective complaints when assessing her RFC by considering her response to treatment and medication, as well as the findings of two state agency medical consultants, discussed *infra*. Thus, the ALJ did not treat the RFC and symptom evaluation as "one and the same," contrary to <u>Dowling</u>; ultimately, as the ALJ explained, she considered "all of the claimant's medically determinable impairments, including those that are not severe" when assessing the RFC (Tr. at 36). See <u>Reid v. Comm'r of Soc. Sec.</u>, 769 F.3d 861, 865 (4th Cir. 2014) (providing that where the ALJ states she has carefully considered the entire record, "absent evidence to the contrary," a reviewing court should "take her at her word"). In the case at bar, even though the ALJ cited to the proper framework early on in the written decision, she obviously carried through to the subsequent steps in the sequential evaluation process, providing substantial evidence in support of her mental RFC findings as noted herein.

In sum, the ALJ complied with her obligation under Section 404.1545(a) and SSR 96-8p, as she not only discussed all the relevant evidence as it related to her moderate limitations, but she also explained what restrictions were included in the RFC assessment to accommodate them. The ALJ not only noted the evidence that demonstrated the Plaintiff's capabilities, but she also noted the evidence that caused greater limitations – this is further demonstrated by the ALJ's evaluation of the opinion evidence of record, finding the Plaintiff was more limited by her mental impairments. The mental RFC assessment is not a product of cherry-picking facts that support a finding of non-disability. Lewis v. Berryhill, 858 F.3d 858, 869 (4th Cir. 2017). Thus, this Court need not have to "guess about how the ALJ arrived" at this conclusion, as it was explained well in this decision, allowing for meaningful judicial review. See Mascio v. Colvin, 780 F.3d 632, 637 (4th Cir. 2015).

The Absence of Manipulative Limitations in the RFC Assessment:

The Plaintiff's next contends that the lack of manipulative limitations in the RFC assessment is not supported by the substantial evidence, as the objective medical record, as well as her own corroborative testimony and statements, warrants their inclusion, however, notwithstanding this omission, the ALJ failed to explain why she omitted these limitations. As noted *supra*, the medical evidence is clear that the Plaintiff suffers from tremors. From the onset of the written decision, in support of her finding the Plaintiff had a severe impairment of conversion disorder with mixed symptoms, the ALJ noted the Plaintiff took medication to treat them (Tr. at 35-36). It was noted that testing showed they were not related to epilepsy, "and more nonepileptic in nature." (Tr. at 36) The ALJ further noted that the evidence showed that the Plaintiff reported her tremors began after she was told her mother was deployed to Texas with FEMA, and that she had been under increased

financial and social stressors (Tr. at 36, 438). The ALJ acknowledged the Plaintiff's testimony "that she shakes all day with tremors in her hands, torso and sometimes even her voice", but she can also "drive short distances." (Tr. at 41) In assessing her RFC, the ALJ recognized that an electroencephalogram (EEG) from June 2018 showed "no clear paroxysmal changes or epileptiform discharges", but it was though that the Plaintiff's tremors "could be due to anxiety or the effect of medication" (Tr. at 41, 378). A repeat EEG in March 2019 also did not show epileptiform activity (Tr. at 41-42, 432-433). Significantly, the ALJ noted that neurology records showed that the Plaintiff's tremors improved with medication and mental health treatment: she was referred to psychiatry due to anxiety symptoms, as her tremors "could be related to mood issues." (Tr. at 42) The ALJ also considered the records showing that the Plaintiff "[o]riginally denied a referral", and that although a referral was made in January 2019, by March 2019, the Plaintiff still had not made an appointment (Tr. at 42, 459, 452, 435). It was noted that the Plaintiff's neurology provider "stressed" the Plaintiff to establish psychiatry treatment for her anxiety symptoms (Tr. at 42, 435). By late June 2020, the record showed that Plaintiff "had significant improvement since starting Topamax"; she had "only a minimal tremor"; and her tremors "improved in her migraines were less frequent (Tr. at 42, 580-585, 574-579).

Despite finding the Plaintiff had good results with medication and treatment, the ALJ also considered the evidence showing that she "was not always compliant with her medication which exacerbated her symptoms" – also, the Plaintiff "was a heavy caffeine user." (Tr. at 42) With treatment, her symptoms improved, however, the ALJ recognized that in August 2020, the Plaintiff could not tolerate her medication, Propranolol, due to her heart rate and blood pressure, and that she requested another Botox injection, as it helped the "degree of her headaches." (Tr. at 42-43)

23

The ALJ noted that the Plaintiff reported "her tremors were now more problematic, but [she] also reported significant family stressors" (Tr. at 43, 564-569). The ALJ also considered that during the examination at the time, the Plaintiff "had a distractible head titubant which was highly variable in amplitude and frequency" though "all other areas and findings were unremarkable" (Id.).Though the Plaintiff's medications were changed, by her next appointment, it was noted she stopped taking them because they made her feel drowsy; she also reported drinking more than twenty (20) cans of soda per day. (Tr. at 43, 555, 558-563) She was advised to begin tapering off caffeine. (Id.)

The ALJ noted that by her next appointment, while her headaches improved, the Plaintiff's tremors remained "bothersome" (Tr. at 43, 551-553), and by May 2021, the treatment records noted that her tremor "was significantly provoked by her unmanaged anxiety and depression" and that the Plaintiff "was experiencing family stressors but had not been following with psychiatry." (Tr. at 43, 542-544) Again, the ALJ observed that when the Plaintiff followed with psychiatry and took her medication, her symptoms improved substantially. (Tr. at 43)

The ALJ examined neurology clinic notes from February 2022 that showed the Plaintiff continued to complain of intermittent neck/head shaking spells, and that during the exam, her tremor was mild in the beginning, but progressively increased. (Tr. at 43, 793, 794) But the notes also indicated that the Plaintiff's tremor responded to Propranolol, and the neurological examination was within normal limits, excepting her distractible neck tremor which varied in amplitude and frequency (Tr. at 43, 794).

Regarding the consultative physical examination performed in January 2021 with Ms. Cummings, discussed *supra*, the ALJ noted the results were normal, save for the Plaintiff's tremors; notably, however, the Plaintiff exhibited full grip strength, normal fine manipulation, opposed

24

fingers, the ability to make fists, and range of motion normal throughout. (Tr. at 43, 465-471)

Based on the evidence regarding her physical impairments, including her tremors resulting from her conversion disorder, the ALJ determined that the sedentary RFC, described *supra*, best accommodated the Plaintiff's limitations (Tr. at 44). The ALJ again noted that the Plaintiff's tremors responded well to medication and treatment prior to her alleged onset date (Tr. at 44, 506-512, 500-505, 494-499). The ALJ again stated that "[t]he records clearly document that the claimant improved with treatment[]" and when she was started on Topamax for her migraines, it "resulted in significant improvement in tremor." (Tr. at 44-45, 477-481) Again, the ALJ pointed out that the Plaintiff was supposed to return in two months for treatment, but did not until six months later. (Tr. at 45) Noting that the Plaintiff reported having more tremors, while also not attending therapy sessions, the ALJ noted that the Plaintiff also reported that her father had poor results from chemotherapy. (Tr. at 45, 632) Because the record indicated that the Plaintiff's generalized anxiety disorder, depressive disorder and conversion disorder that causes her tremors when she is stressed, the ALJ limited the Plaintiff to only low stress work, as described in the RFC, *supra*. (Tr. a 45)[4]

Regarding the opinion evidence concerning the Plaintiff's physical impairments, the ALJ noted both medical consultants opined the Plaintiff could perform light exertional level work, but

---

[4] The Plaintiff takes issue with the ALJ's finding on this point, arguing that "there is nothing in the record to indicate that her tremors are solely due to stress." (ECF No. 8 at 12) However, the Plaintiff also does not reference or cite to other evidence of record that would necessarily contradict the ALJ's assessment here, or what should have been considered in light of the ALJ's restricting the Plaintiff to low stress work. Nevertheless, the record is replete with evidence that shows that the Plaintiff's tremors were the result of "stressors" as noted by her treating providers, which underscores the repeated recommendations and referrals for psychiatric treatment and medication. Outside of excessive caffeine consumption, which the ALJ observed in her decision (Tr. at 43), substantial evidence supports a finding that the Plaintiff's tremors were the product of stress. See Biestek v. Berryhill, 139 S.Ct. 1148, 1154 (2019) (substantial evidence means only such relevant evidence as a reasonable mind might accept as adequate to support a conclusion).

the ALJ found the Plaintiff's impairments restricted her to sedentary work, and found both opinions

not persuasive. (Tr. at 46) Of significance to this appeal, the ALJ also noted that at the initial level

of review, the medical consultant opined the Plaintiff could frequently handle and finger in both

upper extremities, whereas at the reconsideration level, the consultant opined the Plaintiff had no

manipulative limitations. (Tr. at 46) The ALJ explained that the consultant at the initial review "did

not provide a clear cause for these restrictions."[5] (Id.) Having found that the evidence supported the

controlling RFC, the ALJ again noted that the Plaintiff improved with treatment. (Tr. at 47)

If there is a recurring theme in the ALJ's written decision, it is that during the relevant

period, and even prior to the alleged onset date, the Plaintiff's symptoms were significantly

improved or managed when she was compliant with recommended therapies and medication. See

20 C.F.R. § 404.1529(c)(iv)-(v) (evaluation of symptoms includes consideration of effectiveness

of medication and treatment); Gross v. Heckler, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom

can be reasonably controlled by medication or treatment, it is not disabling.") When the Plaintiff

failed to comply with her medication regime, her symptoms worsened. Pursuant to the regulations,

to receive benefits, a claimant must follow treatment prescribed by medical sources if the treatment

is expected to restore the ability to work. See 20 C.F.R. § 404.1529(c)(3)(iv)-(vi) (noting that

treatment, and thus, failure to pursue treatment, is a factor that the ALJ can use to evaluate the

severity of a claimant's symptoms); Id. § 404.1530(a) (providing that if prescribed treatment can

---

[5] The record provides, at the initial level of review, the State Agency medical consultant determined the Plaintiff was unlimited in her ability to reach in any direction, as well as in feeling, but found she was restricted to handling and fingering in both hands to frequently. (Tr. at 95-96) The RFC form at this level asked for an explanation for the manipulative limitations "and how and why the evidence supports your conclusions" and to "[c]ite specific facts upon which your conclusions are based", but the consultant only stated "limited to frequently" without further explanation. (Tr. at 96)

restore an individual's ability to do work-related functions, he or she must comply with it); SSR 16-3p, 2016 WL 1119029, *8 (Mar. 16, 2016) (noting that the Social Security Administration will consider whether an individual follows prescribed treatment when evaluating the individual's ability to perform work activities and providing that "if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record"); Mickles v. Shalala, 29 F.3d 918, 930 (4th Cir. 1994) (holding that inconsistency between a claimant's allegations about the severity of an impairment and the actual treatment sought is probative evidence of non-disability). In this case, the ALJ properly considered the Plaintiff's improvement with treatment and medication, and the worsening of her symptoms when she failed to continue treatment or medication when she crafted the RFC.

In sum, the ALJ thoroughly reviewed the medical record regarding the Plaintiff's tremors and reasonably found that it did not support manipulative limitations. While the Plaintiff has asserted her disagreement with the ALJ's RFC determination, and urges this Court to adopt her view on this particular issue, that would amount to an impermissible re-weighing of the conflicting evidence of record: a court does "not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996)). The resulting RFC assessment concerning the Plaintiff's physical (and mental) impairments included the required narrative discussion that allows for meaningful judicial review and with respect to the findings of fact and conclusions provided in the written decision. It is also clear that the ALJ complied with the mandate to "build an accurate and logical bridge from the evidence to

[her] conclusion." <u>Monroe v. Colvin</u>, 826 F.3d 176, 189 (4th Cir. 2016) (quoting <u>Clifford v. Apfel</u>, 227 F.3d 863, 872 (7th Cir. 2000)).

Accordingly, the undersigned **FINDS** that the RFC assessment is supported by substantial evidence, and further **FINDS** the final decision of the Commissioner denying benefits is supported by substantial evidence.

## **Recommendations for Disposition**

For the reasons set forth above, it is hereby respectfully **PROPOSED** that the District Judge confirm and accept the foregoing findings and **RECOMMENDED** that the District Judge **DENY** the Plaintiff's request for remand (ECF No. 8), **GRANT** the Defendant's request to affirm the decision (ECF No. 9), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and then three days (mailing/service) from the date of filing this Proposed Findings and Recommendation within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection. Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.

Snyder v. Ridenour, 889 F.2d 1363, 1366 (4ᵗʰ Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 106 S.Ct. 466, 475, 88 L.E.2d 435 (1985), reh'g denied, 474 U.S. 1111, 106 S.Ct. 899, 88 L.E.2d 933 (1986); Wright v. Collins, 766 F.2d 841 846 (4ᵗʰ Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4ᵗʰ Cir.), cert. denied, 467 U.S. 1208, 104 S.Ct. 2395, 81 L.E.2d 352 (1984). Copies of such objections shall be served on opposing parties, District Judge Copenhaver, and this Magistrate Judge.

The Clerk of this Court is directed to file this Proposed Findings and Recommendation and to send a copy of same to counsel of record.

ENTER: August 17, 2023.



Omar J. Aboulhosn
United States Magistrate Judge